IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| FRANK J. TEERS ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 2:15cv178-MHT |
| ) | (WO) |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Before the court is petitioner Frank J. Teers's ("Teers") *pro se* motion under 28 U.S.C. § 2255 to vacate, set aside, or correct sentence by a person in federal custody. Doc. No. 1.[1]

**I.   INTRODUCTION**

On June 4, 2013, a jury found Teers guilty of one count of conspiracy to commit wire and bank fraud, in violation of 18 U.S.C. §§ 1343, 1344, 1349; six counts of aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 1342 and 2; and three counts of aiding and abetting bank fraud, in violation of 18 U.S.C. §§ 1344 and 2. Teers's convictions arose from his and his codefendants' scheme to obtain multimillion dollar loans from financial institutions based on false representations that one of the codefendants controlled a large bond portfolio that could serve as collateral.[2] Through the scheme, Teers and his codefendants obtained a loan of over $60 million.

---

[1] References to document numbers ("Doc. No.") are to those assigned by the Clerk of Court in this action. All page references are to those assigned by CM/ECF.

[2] Teers was a registered stockbroker. His codefendants were Paul Hulse, Sr., a businessman for whom Teers served as a broker and set up various investment accounts, and Steven P. Mock, an attorney who served as counsel to H&H Worldwide Financial Service, Inc., a Texas corporation controlled by Hulse.

On November 27, 2013, following a three-day sentencing hearing, the district court sentenced Teers to 97 months' imprisonment on each count, all sentences to run concurrently.

Teers appealed, and on December 2, 2014, the Eleventh Circuit Court of Appeals entered an opinion affirming his convictions and sentence.[3] *Teers v. United States*, 591 Fed. App'x 824 (11th Cir. 2014). Subsequently, the United States Supreme Court denied Teers's petition for a writ of certiorari.

On March 16, 2015, Teers filed this motion for relief under 28 U.S.C. § 2255 in which he claims that his trial counsel's deficient performance in advising him during the pretrial plea process caused him to reject a favorable plea offer from the government and to instead go to trial. Doc. No. 1 at 4; Doc. No. 2 at 9–14. The government responds that Teers is entitled to no relief on his claim because he fails to establish deficient performance by counsel and resulting prejudice. Doc. No. 9.

After considering the parties' submissions, the record, and the applicable law, the court concludes that the § 2255 motion should be denied without an evidentiary hearing. Rule 8(a), *Rules Governing Section 2255 Proceedings in the United States District Courts*.

## II.   DISCUSSION

### A.   General Standard of Review

---

[3] On appeal, Teers claimed: (1) the district court erred in denying his motion to suppress his statements made during an interview by special agents for the IRS; (2) the magistrate judge abused his discretion at the suppression hearing by (a) disallowing Teers's trial counsel from cross-examining an IRS agent in detail on Teers's relationship to the IRS's tax investigation of one of Teers's codefendants and (b) not admitting and considering an IRS policy manual; (3) the government's evidence was insufficient to support his convictions; (4) the district court abused its discretion in applying a two-level enhancement under U.S.S.G. §2B1.1(b)(2)(A) for an offense involving more than ten victims; and (5) the district court erred in refusing to grant him a two-level reduction under U.S.S.G. § 3B1.2(b) for being a minor participant in the criminal conduct. *See* Doc. No. 9-18 at 10, 33–77.

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on final judgments under 28 U.S.C. § 2255 are limited. A prisoner is entitled to relief under § 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255; *United States v. Phillips*, 225 F.3d 1198, 1199 (11th Cir. 2000); *United States v. Walker*, 198 F.3d 811, 813 n.5 (11th Cir. 1999). "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'" *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted).

### B. Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel is evaluated against the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). First, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 689. Second, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. *See Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000).

Scrutiny of counsel's performance is "highly deferential," and the court indulges a "strong presumption" that counsel's performance was reasonable. *Chandler*, 218 F.3d at 1314 (internal quotation marks omitted). The court will "avoid second-guessing counsel's performance: It does not follow that any counsel who takes an approach [the court] would not have chosen is guilty of rendering ineffective assistance." *Id*. (internal quotation marks and brackets omitted). "Given the

strong presumption in favor of competence, the petitioner's burden of persuasion—though the presumption is not insurmountable—is a heavy one." *Id*.

As noted, under the prejudice component of *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

Unless a petitioner satisfies the showings required on both prongs of the *Strickland* inquiry, relief should be denied. *Strickland*, 466 U.S. at 687. Once a court decides that one of the requisite showings has not been made, it need not decide whether the other one has been. *Id*. at 697; *Duren v. Hopper*, 161 F.3d 655, 660 (11th Cir. 1998).

### C. Counsel's Performance Regarding Plea Offer and Decision to Go to Trial

Teers contends that his attorney Paul R. Cooper's deficient performance in advising him during the pretrial plea negotiation process caused him to to reject a plea offer from the government and to instead go to trial, where he was convicted of multiple counts and received a harsher sentence than the one in the plea offer. Doc. No. 1 at 4; Doc. No. 2 at 9–14. Teers alleges that Cooper's advice was deficient because (1) his codefendant Paul Hulse, Sr. pled guilty and was available to give damaging testimony against him at trial; (2) Cooper informed him on several occasions that his case could be won; (3) Cooper advised him to go to trial even though there was overwhelming evidence of his guilt and Cooper had no viable defense strategy to the charges; (4) Cooper grossly underestimated his sentencing exposure if he rejected the plea offer and went to trial; and (5) Cooper failed to advise him of the law in relation to the facts in the case. Doc. No. 2 at 9–14. Teers essentially argues that Cooper should have convinced him to accept the plea offer instead of going to trial.

4

The Supreme Court has long recognized that *Strickland*'s two-part inquiry applies to ineffective assistance of counsel arising out of the plea process. *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985). More recently, in *Lafler v. Cooper*, 566 U.S. 156 (2012), the Court clarified that the right to effective assistance of counsel extends to the negotiation and consideration of plea offers that lapse or are rejected. *See In re Perez*, 682 F.3d 930, 932 (11th Cir. 2012). To demonstrate ineffective assistance of counsel here, Teers must show that his attorney gave him deficient advice regarding a plea offer, causing him to reject the plea and then to receive a harsher sentence after being convicted at trial. *Lafler*, 566 U.S. at 167–70. *Lafler* requires that a defendant receive competent counsel regarding the decision to accept or reject a plea offer. *Id*.

Teers's trial counsel, Cooper, filed an affidavit with attached exhibits addressing Teers's allegation that he rendered ineffective assistance during the pretrial plea process. Doc. No. 8; Doc. Nos. 8-1 through 8-10. Those exhibits include numerous emails Cooper sent to Teers during plea negotiations discussing, among other things, the nature of the government's evidence against Teers and a list of the government's witnesses; the law that would apply in his case (including the jury instructions the trial court was likely to give); the U.S. Probation Office's preliminary estimates of how the Sentencing Guidelines would apply to Teers, both if he pled guilty and if he proceeded to trial and was convicted; Cooper's own representations to Teers about what he believed were the best case and worst case scenarios for his sentence under either a guilty plea or convictions in a trial; and a plea offer made by the prosecutor in which the government agreed to recommended that Teers receive a sentence of not more 60 months' imprisonment in exchange for pleading guilty to the conspiracy count. *See* Doc. Nos. 8-1 through 8-10. This court quotes from Cooper's affidavit at length:

> 1. My name is Paul Cooper, and I practice law [in] … Montgomery, Alabama. I was admitted to the Alabama State Bar on April 19, 1977.

5

2. I represented Frank J. Teers in the criminal case of *United States of America v. Frank J. Teers*, in the United States District Court for the Middle District of Alabama, Case No. 2:12crl04-MHT, in which he was found guilty of eleven counts for the conspiracy to commit bank and wire fraud and the commission of bank and wire fraud; in the appeal of the guilty verdict and sentence to the United States Court of Appeals for the Eleventh Circuit, Case No. 13-1567-E, which were affirmed; and in a petition for writ of certiorari to the United States Supreme Court which was denied.

3. I gave Frank Teers a copy of the indictment. We continuously discussed the allegations by phone or email. The indictment was well laid out and explicitly and thoroughly detailed the government's allegations on the specific acts done by Frank Teers and others when they committed the conspiracy, bank and wire frauds.

4. I mailed to Teers in Houston, Texas all of the discovery DVD disks, or made them available for his review in Houston. I sent him a copy by email of every pleading that I filed, the government response, the decision of the United States Magistrate, and the decision of the United States District Judge, and all motions that the government filed, my response, and the decision. He was informed throughout the case of all legal and evidentiary developments. I sent him a copy of the transcripts of testimony or proffers with exhibits of important witnesses, such as his boss, Richard Payne, and Richard Crouch, his contact at the bank.

5. On June 13, 2014 Andrew Schiff, the prosecuting United State Attorney, gave Teers and I a "reverse proffer" in which he hand delivered to Frank and I in his office the documentary evidence that he proposed to use to convict Teers. He explained in detail the documents to us, how he was going to use the documents, how the documents related to the charges, and what it represented. Furthermore, Schiff gave us a 4-page, detailed timeline entitled "FOR DISCUSSION PURPOSES ONLY" which sets out chronologically the fraudulent acts of Teers and others. Schiff reviewed and explained his timeline to us, how it related to the charges, and the specific acts that Teers and others did that violated the criminal statutes in which Teers was charged. He basically laid out to us his whole case to us. Later, I went over these documents with Teers, and gave him copies along with the indictment. Teers provided to me his response to Schiff's timeline document. (Ex. 1 - Timeline)

6. On September 12, 2012, I emailed [Teers] a condensed version of the jury instructions on conspiracy, mail fraud, and financial institution fraud from the Eleventh Circuit pattern. I wanted him to be aware of how the judge would instruct the jury on the law. (Ex. 2 - Email re Jury Instructions)

7. In August or September 2012 I requested the United States Probation Officer to provide me a preliminary estimate of the sentencing guidelines. I received her estimates on November 7, 2012, by email and promptly forwarded

6

them by email to Teers the same day. In the email, I told him his sentence would be very lengthy if convicted. Her calculation was a total offense level of 43 and with acceptance of responsibility an offense level 40 with a guideline range of 292 to 365 months. Without acceptance of responsibility or going to trial and being found guilty, her total offense level was 42 with a guideline range of life in the penitentiary. (Ex. 3 - Probation Sentence Estimate)

       7[A]. On November 13-14, 2014 Teers attended by video a hearing on our motion to suppress an interview by Internal Revenue Service Criminal Investigation Agents (IRS) of Teers on June 15, 2005. Teers heard the IRS testimony and reviewed the IRS memorandum of the interrogation. The agents testified that their sources told them that Hulse was purporting to own bonds to put up for security on multimillion dollar loans. The IRS testified that Teers was told that Hulse was going around to financial institutions providing CUSIP [Committee on Uniform Security Identification Procedures] numbers as bonds owned by Hulse, and that he was possibly committing bank and security fraud. Teers denied he was telling banks Hulse owned the bonds. It was explained to Teers that Hulse was using CUSIP numbers provided by Teers to claim Hulse owned the bonds, which Teers denied. (Ex. 4 - June 15, 2005 IRS Memo).

       8. In late June 2015 Frank Teers began to help negotiate a multimillion dollar pledge and security agreement with a federal land bank, Teers' employer, and co-defendant Hulse in which Teers signed on behalf of his employer. It provided that Hulse would put up as collateral bonds to be held by Teers' employer that Hulse already owned—which he didn't. It was signed by Teers in August 2005 and another pledge agreement among the parties was signed in December 2005.

       9. On January 11, 2013, I emailed to Teers his letter to Jerry Behm of MetLife Insurance Company dated June 28, 2004, and Behm's memo of a telephone conversation with Teers on July 8, 2004. In it Behm stated that Teers confirmed to him that Hulse had a bond portfolio in excess of $700 million, and a specific $250 million bond portfolio that would be earmarked to support a timber investment that Hulse was requesting a loan from MetLife for. I told Teers his letter and the Behm memo looked bad. (Ex. 5 - Email with MetLife Docs.)

       9[A]. On March 12, 2013, I forwarded to Teers by email the sentencing guideline estimate of Schiff. If convicted, he estimated a worst-case sentence of life in the penitentiary, and a best case of 87–108 months. With a plea agreement under the present charges, he estimated a worse case of 292–365 months, and a best case of 63–78 months. Schiff offered to allow Teers to plea to an information of a conspiracy under 18 USC § 371 which carried a five-year maximum sentence. I further detailed to him how a five-year sentence would play out to about 33 months' incarceration and asked him to talk to his family about it. He emailed me back that he thought the plea offer was an indication of the weakness of the case, and that the plea agreement was not enough incentive to lie and say he did something wrong. Teers rejected the plea agreement because he maintained that he was innocent of

all charges.  Teers maintained at all times that he was innocent under any circumstances and scenarios.  (Ex. 6 - Schiff 3/12/13 Sentence Estimate with Emails)

      10. On March 14, 2013, I had a telephone conversation with Teers and explained my March 12, 2013 email on the plea bargain from Schiff.  In the conversation, I discussed with him the potential risks and possible sentences.  I advised him on the worst case and best case for sentencing under a plea to the original charges or a conviction on the original charges.  I reminded him of the government offer for him to plea to a conspiracy with a 5-year maximum sentence.  Teers wanted to go to trial and testify.  He did not want any plea agreement.  I further explained the two pieces of evidence that were strong against him were the IRS interview on June 15, 2005, and a letter he wrote on behalf of Hulse to Jerry Behm of MetLife Insurance Company.  Teers denied the IRS allegations in their memorandum of the June 15, 2005 interview.  I emailed the transcript of the proffer of Richard Crouch.  He was the main witness against Teers.  His testimony was damaging. (Ex. 7 - March 14, 2013 Telephone Note to File)

      11. On April 24, 2013, I emailed Teers and noted that I had sent him a list of the government's documentary evidence and a list of their witnesses.  (Ex. 8 - April 24 Email)

      12. On April 27, 2013 I emailed what I thought were damaging documents in regard to a proposed loan to MetLife Insurance Company.  I emailed again Teers' letter to Mr. Behm of Metlife, and Behm's memorandum of the conversation with Teers.  These documents were very damaging to his case, and I told him they were.  The Teers' letter and Behm's memorandum indicated that Teers told him Hulse had a large bond portfolios which totaled $950 million which he did not.  I reminded Teers about the plea bargain of a maximum five years—maybe less—as opposed to a maximum sentence of 30 years.  I had reminded him that I had already gone over what he was looking at with the plea and if he was convicted at trial.  I asked him to call me about this. (Ex. 9 - April 27, 2013 Email with Attachments).

      13. On May 16, 2013, I emailed Teers about if he was going to take the plea agreement for a maximum of five years.  I noted that we could ask the judge for a lesser sentence.  He rejected this. (Ex.10 - May 16, 2013 Email).

      14. Frank Teers did not admit to me that he was guilty.  He adamantly maintained that he was innocent throughout the whole time of my representation.  He maintained that in all scenarios, it was the "business deal" that Hulse was selling.  The land purchased with the loans had collateral to secure the loan, and the loan proceeds would pay for bonds that would make the loan payments and be collateral.  I told Teers that I thought that we can win the case.  However, I also told him that a jury would have to believe him and not believe the government's witnesses and evidence.  I never guaranteed Teers that we would win the case, or that the government's case was weak, or that the jury would believe him instead of

the government's witnesses and evidence, or gave him a percentage or odds on us winning the case, or indicated that it was a "slam dunk" for us to win the case. From the beginning to the end, he wanted to go to trial because he stated he was innocent.

    15. Last, Teers received a very favorable sentence. The United States Probation Officer's presentence investigative report had a guideline sentence of 3,600 months' imprisonment. The United States Attorney argued the intended loss which included the 68.5 million loan and all of the attempted loan amounts was $1,963,500,000. (Doc. 377-3) The AUSA recommended 3600 months' incarceration under an "Intended Loss" amount calculation and 262–327 months imprisonment under an "Actual Loss" amount calculation with restitution of $39,239,561.06 from a $68.5 million bank fraud. (Govt. Sent. Memo, p. 8)

    In the Middle District of Alabama, a recent fraud case prior to the Teers sentencing which involved similar amounts resulted in an 18-year sentence. The reported Eleventh Circuit fraud cases that involved lesser amounts resulted in horrendous sentences. Teers is very fortunate with the sentence he received. It could have been a lot worse.

Doc. No. 8 at 1–8.

Teers's allegation that Cooper performed deficiently in advising him regarding the benefits of accepting the government's plea offer versus going to trial is belied by Cooper's affidavit and the attached exhibits. The affidavit and exhibits demonstrate that Cooper fully advised Teers of the terms of the plea offer (*see, e.g.*, Doc. No. 8 at 5–7; Doc. No. 8-6 at 1–2; Doc. No. 8-9); that he provided Teers with his and the probation office's accurate estimates of his sentencing exposure, either if he pled guilty or if he proceeded to trial and was convicted (*see* Doc. No. 8-3 at 3–4; Doc. No. 8-4 at 3–4; Doc. No. 8-6 at 1–2; Doc. No. 8-9); and that he provided Teers with an explicit accounting of the government's evidence, an accounting facilitated by the detailed allegations in the indictment and the prosecutor's willingness to provide the defense with a "reverse proffer" laying out the government's case against Teers (*see* Doc. No. 8 at 1–2; Doc. No.

9

8-1; Doc. 8-8).[4] Teers presents this court with nothing to gainsay these matters, and he does not deny the veracity of Cooper's statements in his affidavit or attempt to rebut the documentary evidence indicating that he was fully advised about the government's case. Teers's assertion that Cooper grossly underestimated his sentencing exposure is conclusory and unsupported by a specific allegation as to what Cooper told him regarding his sentence. Weighing Teers's cursory assertion against Cooper's affidavit and the documentary evidence reflecting that Cooper properly advised Teers regarding his sentencing exposure, the court finds Teers fails to prove deficient performance here.

Further, contrary to Teers's assertion that Cooper, when advising him, inflated his chances of winning if he went to trial, Cooper's affidavit and attached exhibits reflect that Cooper was suitably cautious in his representations to Teers about the possibilities of acquittal. Although Cooper told Teers he thought he could win at trial, he tempered any optimism by telling Teers that, if he were to avoid conviction, the jury must believe him and not believe the government's witnesses and evidence. *See* Doc. No. 8 at 7. Cooper's emails and notes also establish that, more than once, Cooper advised Teers that parts of the government's evidence "looked bad" for Teers, were "damaging," or were strongly against him. *See, e.g.*, Doc. No. 8-5 at 1; Doc. No. 8-7; Doc. No. 8-9. This belies Teers's claim that Cooper's advice to him overestimated the possibilities of

---

[4] Regarding Teers's assertion that Cooper's advice was deficient because his codefendant Paul Hulse, Sr., who pled guilty, might testify against him at a trial, Teers does not allege that Cooper failed to inform him of that possibility or that he was unaware of that possibility. (Hulse did not testify at trial.) Cooper's affidavit and the attached documentary evidence reflect that Cooper informed Teers about the likely damaging testimony of the government's expected witnesses. For instance, Cooper advised Teers about the damaging contents of a proffer by Richard Crouch, a loan originator for the Montgomery bank from which Teers and his codefendants obtained large loans based on material misrepresentations that Teers made to Crouch. *See, e.g.,* Doc. No. 8 at 5–6; Doc. No. 8–7.

10

acquittal. As the government rightly observes in responding to Teers's claim, there is a difference between counsel guaranteeing that a case will be won, and a representation that a case might be won. *See* Doc. No. 9 at 67. There was no guarantee from Cooper.

Teers also does not contradict Cooper's averments that, after he informed Teers of the government's plea offer, Teers told him he thought the offer indicated the weakness of the government's case and was not favorable enough to induce him to plead guilty when he had done nothing wrong.[5] A copy of an email from Teers to Cooper submitted by Cooper with his affidavit confirms Cooper's account of Teers's response upon hearing of the government's plea offer. *See* Doc. No. 8-6 at 1. Nor does Teers deny that he always insisted to Cooper he was innocent and wanted to go to trial because he was innocent. Teers's present insistence that he would have pled guilty had Cooper not performed deficiently is undermined by his repeated claims of innocence. *See Osley v. United States*, 751 F.3d 1214, 1225 (11th Cir. 2014) ("Osley's insistence on his innocence, both before and after trial, makes it more difficult to accept his claim that he would have taken a fifteen-year plea deal.").

The allegations in the § 2255 motion come down to little more than a claim that, despite Teers's protestations of innocence and his expressed unwillingness to accept a plea offer, Cooper should have insisted more adamantly that he plead guilty. It is not unfair to speculate that, had Cooper pressed further and convinced Teers to plead guilty under these circumstances, Teers would now be arguing that his guilty plea was involuntary and a product of his will being overborne by Cooper's implorations and undue pressure. The record reveals that Teers, when

---

[5] Teers alleges that Cooper failed to advise him of the law in relation to the facts. This allegation is belied by Cooper's affidavit and the documentary evidence. Furthermore, Teers does not identify what law needed to be explained to him so that he might have made a better informed decision about pleading guilty, or in what way he did not understand what Cooper explained to him about the charges and the evidence.

considering Cooper's advice and then rejecting the plea offer and opting to go to trial, heard what he wanted to hear and saw what he wanted to see.  Teers, as was his right, chose to roll the dice, reject the plea offer, and proceed to trial.  However, he fails to show his decision resulted from deficient performance by Cooper in his advice to him during the pretrial plea process.  Consequently, he is entitled to no relief on his claim of ineffective assistance of counsel.

### III.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the 28 U.S.C. § 2255 motion filed by Teers be DENIED and this case DISMISSED with prejudice.

It is further

ORDERED that the parties shall file any objections to this Recommendation or before March 31, 2017.  A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered.  Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) will bar a party from a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11th Cir. R. 3-1.  *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Done this 14th day of March, 2017.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE